# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HORACE E. JENNINGS, JR., et al.

    *Plaintiffs*,

    *v.*

CITY OF BRIDGEPORT, et al.,

    *Defendants*.

No. 3:16-cv-117 (MPS)

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

On January 23, 2013, the Bridgeport Police and the Jennings family had an altercation at the Jennings' home. The incident ended with the officers arresting Horace and Margaret Jennings, along with their three sons, Bernard, Dennis, and Eric Jennings, on various charges and forcing entry into their home. The Jennings claim that the incident stemmed from one officer's effort to harass them while they were peacefully going about their evening, but the officers claim that the Jennings refused to comply with police orders, attacked them, resisted arrest, and threatened them.

Despite numerous factual disputes about exactly what happened in an apparently fast-moving, chaotic situation, the parties have filed cross-motions for summary judgment. (ECF Nos. 27, 29, 30.) The defendants have moved for summary judgment on all claims except for the falsification of evidence claim, and the plaintiffs have cross-moved for summary judgment on their claims of false arrest, malicious prosecution, retaliatory arrest, and unlawful entry into curtilage. For the reasons that follow, the defendants' motion for summary judgment is GRANTED only as to (1) Horace's and Eric's claims of malicious prosecution and false arrest, (2) Bernard's, Margaret's, and Dennis's false arrest and malicious prosecution claims against all defendants other than Rivera, (3) the Jennings' *Monell* claim, (4) the Jennings' excessive force claim against all defendants except for Lynch, (5) Horace's and Margaret's First Amendment claims, and (6) Eric's, Bernard's, and Dennis's First Amendment claims against all defendants except for Rivera; the

1

defendants' motion is otherwise DENIED, and the plaintiffs' motions for summary judgment are DENIED. Further, the plaintiffs' motion to amend the complaint, which was filed after the defendants had moved for summary judgment, is DENIED.

## I. Background

### A. Facts

The following facts are taken from the parties' Local Rule 56(a) Statements. (ECF Nos. 27-19, 43-1). Additional facts are discussed in the analysis where relevant. The facts are undisputed unless stated otherwise.

On January 23, 2013, Officers John Carrano and David Rivera and Sergeants Sean Lynch and William Simpson were employed as City of Bridgeport police officers. (ECF Nos. 27-19 at ¶ 1, 43-1 at ¶ 1.) At approximately 8:30 p.m. that night, Officers Carrano and Rivera were assigned to cover the east side of Bridgeport, and the officers were patrolling the area of Stillman Street and Pleasant Street. (ECF Nos. 27-19 at ¶¶ 2, 4, 43-1 at ¶ 2, 4.) It was approximately 10 degrees Fahrenheit outside. (ECF Nos. 27-19 at ¶ 3, 43-1 at 3.)

The defendants claim that there had been "several robberies, burglaries[,] and narcotic[s] activity" in this area (ECF No. 27-19 at ¶ 4), which the Jennings deny. The Jennings state that it was not an area that police patrolled. (ECF Nos. 43-1 at ¶ 4, 43-10 at 22–23 (Dennis stated in his deposition that the "area is pretty quiet. Everybody stays to themselves. It's like older families," and that the area was "the only area on Stillman that's not congested.").) Officer Rivera stated that he had received at least two prior complaints of suspected criminal activity occurring in that area (ECF No. 27-19 at ¶ 5), but the Jennings object that they never received police reports from those incidents, despite asking for them. (ECF No. 43-1 at ¶ 5.) The defendants also state that this area was "a busier area with regard to people walking to and from a nearby corner convenience store."

(ECF No. 27-19 at ¶ 6.) The Jennings deny that people were walking in the area and state that only Dennis, Eric, and Bernard were on the street at that time. (ECF Nos. 43-1 at ¶ 6, 43-4 at ¶ 25.)[1]

The Jennings' house sits on the corner of Pleasant Street and Stillman Street in Bridgeport. (ECF No. 43-7 at ¶ 4.) A chain link fence surrounds their property. It is about waist-high, encloses a small yard, and does not block the view into the yard from the street. (ECF No. 43-7 at 2, ¶ 5, 43-7 at 7, 9.) There is both a front door on Pleasant Street and a side door on Stillman Street. (*Id.*) Both have gates in the chain link fence in front of them and a short path leading up to a porch. (*Id.*) The police incident report states that the Jennings brothers were standing on Stillman Street when Rivera made contact with them. (ECF No. 27-3 at 3.) There is a streetlight on Stillman Street near the side entrance. (ECF No. 43-7 at ¶¶ 5, 6.)

Officers Carrano and Rivera state that they saw Eric and Dennis on the sidewalk area of Stillman Street, stopped the patrol car to speak to them, began talking to them, and then requested that the brothers move onto their property. (ECF No. 27-19 at ¶¶ 7–8.) The Jennings claim that Rivera instead immediately began "yelling commands with expletives and initiating the confrontation." (ECF No. 43-1 at ¶ 8, 43-11 at 4–5 (stating that Rivera yelled "You heard what I said. Get the 'f' in the gate.").) Dennis responded "why . . . we're not doing anything." (ECF Nos. 27-19 at ¶ 9, 43-1 at ¶ 9.) Eric stated that the police were always "harassing [the Jennings]" and made a hand gesture at Rivera. (ECF Nos. 27-19 at ¶¶ 10–11, 43-1 at ¶¶ 10–11.) Rivera asked two or three times for Eric and Dennis to enter their property, and he stated that he observed "other people in the area come out of their house or stop on their way to or from the corner store." (ECF No. 27-19 at ¶¶ 12–13.) The Jennings deny that other people were drawn outside by the incident and cite the cold weather as a reason they were not. (ECF No. 43-1 at ¶ 13.)

---

[1] I will refer to each of the Jennings by first name in this opinion to avoid confusion.

Although Rivera states that Eric and Dennis then "continued to walk onto their property," he "determined that he was going to arrest Dennis" and was "able to walk with Dennis to the sidewalk area where he patted him down to make sure that [Dennis] was not armed and requested identification." (ECF No. 27-19 at ¶¶ 14–16.) Dennis does not dispute that this happened, but he claims that it was not a valid arrest because he was exercising his First Amendment rights while complying with Rivera's request to go inside and that he was "on the steps" of the porch when Rivera grabbed him. (ECF No. 43-1 at ¶¶ 12–16.)

While Rivera was interacting with Dennis, Eric went into the house and, subsequently, several other members of the Jennings family came outside. (ECF Nos. 27-19 at ¶ 17, 43-1 at ¶ 17.) When Horace exited the house, he "heard a lot of noise and saw his wife [Margaret] with his sons [Dennis and Bernard] at the fence yelling back and forth." (ECF Nos. 27-19 at ¶¶ 18–19, 43-1 at ¶¶ 18–19.) Bernard stated to the officers, "What, ya'll bored or something? We wasn't doing nothing." (ECF Nos. 27-19 at ¶ 20, 43-1 at ¶ 20.) When Rivera went to put Dennis into the patrol car, Horace approached Rivera to ask what was happening. (ECF Nos. 27-19 at ¶ 22, 43-1 at ¶ 22.) All of the male Jennings were "tall and heavyset," while Rivera and Carrano were "shorter and thinner in stature," (ECF Nos. 27-19 at ¶ 23, 43-1 at ¶ 23) but Rivera worked out, lifting weights. (ECF No 43-1 at ¶ 23.) Dennis was seated in the patrol car, with his feet hanging out. (ECF Nos. 27-19 at ¶ 29, 43-1 at ¶ 29.) Carrano was standing outside the gate. (ECF Nos. 27-19 at ¶ 31, 43-1 at ¶ 31.)

Rivera claims that he advised Horace to step away (ECF No. 27-19 at ¶ 28), while Horace claims that Rivera kept yelling "[g]et the f*ck in the gate." (ECF No. 43-1 at ¶ 28.) Rivera then requested backup units. (ECF Nos. 27-19 at ¶ 30, 43-1 at ¶ 30.) Lynch was patrolling downtown Bridgeport and received a call for assistance at 60 Pleasant Street. (ECF Nos. 27-19 at ¶ 35, 43-1

at ¶ 35.) Lynch claims that, when he arrived at Stillman and Pleasant streets, he "observed several males, a female, and other people congregating by the street." (ECF No. 27-19 at ¶ 38.) The Jennings dispute that anyone else was outside at the time. (ECF No. 43-1 at 38.) Lynch also claims—and the Jennings do not dispute—that he observed "a lot of chaos, yelling, screaming [and] . . . the males were fairly large." (ECF Nos. 27-19 at ¶ 41, 43-1 at ¶ 40.) He then requested additional backup. (ECF Nos. 27-19 at ¶ 40, 43-1 at ¶ 40.)

The record is unclear as to what happened next. The defendants claim that, as Rivera approached the house, Horace grabbed him. (ECF No. 27-19 at ¶ 43, 27-3 at 3 ("As I[, Rivera,] got close to the steps of the home[,] Horace grabbed me by my left shoulder and left mid[]section, grabbing my duty belt near my Taser.").) They state that it was "at this moment" that Lynch tased Horace. (ECF No. 27-3 at 3.) Lynch states that he tased Horace a second time "using a drive-stun technique" because the initial taser "did not appear to have good contact" and Horace was "still resisting." (ECF Nos. 27-11 at 4, 27-19 at ¶ 44.) The Jennings dispute this account: they claim that Horace was instead back at the gate—after Rivera had told him to go back inside—bent over closing it, when he heard an officer yell "take that nigger down" and then felt himself being tased. (ECF No. 43-13 at 13–15.).

In their Local Rule 56(a) statement, the defendants claim that after Horace was tased, Eric, who had gone back inside the Jennings' house after Rivera detained Dennis, yelled out the first floor window, "[y]o, what the hell? You can't shoot my father." (ECF No. 27-19 at ¶ 46.) In the incident report, Rivera and Carrano stated that Eric threatened them from inside the house, saying "I'm going to kill both of you. You both are fucking dead. I'm going to light you guys up." (ECF No. 27-3 at 3.) The Jennings instead claim that Eric, who had seen Lynch tase his father, stated "They shot Dad . . . I'm like, 'You can't shoot my father'" (ECF No. 43-11 at 6), but it is unclear

from his deposition testimony whether he shouted this out the window, said it only to Bernard, who was in the house with him, or, as plaintiffs' counsel suggests, was only "thinking" it. (*See* ECF No. 43-1 at ¶ 46; 43-11 at 6.) Rivera claims that he "perceived [Eric] to be a threat to his and the other officers' safety" because Eric "had a permit to carry a firearm and owned a firearm." (ECF No. 27-19 at ¶ 47.) Eric does not dispute that, "a few weeks before this incident," he was a passenger in a car that the police stopped "because it matched the description of a vehicle that had been involved in a shooting" and, at that time, Eric was "found to be in possession of a firearm." (ECF Nos. 27-19 at ¶ 48, 43-1 at ¶ 48.) Eric had a valid firearm permit. (*Id.*) Rivera informed Lynch of his safety concerns, and Lynch authorized the officers to force entry into the home. (ECF Nos. 27-19 at ¶ 51, 43-1 at ¶¶ 50, 51.)

Meanwhile, Margaret had been told not to leave the porch but then was further advised that she could tend to Horace, after he was tased. (ECF Nos. 27-19 at ¶ 52, 43-1 at ¶ 52.) Further, an "unidentified officer" (who Margaret says was Rivera) asked Margaret to "check her husband's pockets to see if he had keys so that the officers could enter the house." (ECF Nos. 27-19 at ¶ 53, 43-1 at ¶ 53.) While she did not find any keys, she "took his cell phone, some dollars and change out of his pocket before being handcuffed by Officer Lynch." (ECF Nos. 27-19 at ¶ 53, 43-1 at ¶ 53.) By contrast, Rivera and Lynch state that Margaret was handcuffed because she directly disobeyed police orders, going through Horace's pockets and removing items as the defendants were taking him to an ambulance. (ECF No. 27-3 at 4, 27-11 at 9.) Margaret, for her part, claims that she only reached into Horace's pockets because Rivera repeatedly asked her to check them for the keys to the house. (ECF No. 43-12 at 9.)

After Margaret was arrested, entry was "ultimately forced through the door." (ECF Nos. 27-19 at ¶ 57, 43-1 at ¶ 57.) Officer Simpson did not arrive until after Dennis, Margaret, and

Horace were detained. (ECF Nos. 27-19 at ¶ 58, 43-1 at ¶ 58.) He had no contact with Eric or Bernard, but he did enter the Jennings' home. (ECF Nos. 27-19 at ¶¶ 57–58, 4301 at ¶¶ 57–58.) The parties do not agree which officers entered the Jennings' house, but those officers advised the occupants to come downstairs. (ECF Nos. 27-19 at ¶ 59, 43-1 at ¶ 59.) Eric, Eric's girlfriend, and Bernard walked downstairs. (*Id.*) The officers then "conducted a protective sweep of the second floor." (ECF Nos. 27-19 at ¶ 60, 43-1 at ¶ 60.) Carrano claims that he "observed a loaded firearm on top of a stereo speaker in plain view in a second floor bedroom." (ECF Nos. 27-19 at ¶ 60, 27-6 at 5.) The Jennings claim that the gun was not in plain sight, and, instead, the officers kicked down Eric's and Bernard's bedroom doors, which had been locked. (ECF Nos. 43-1 at ¶ 61, 43-11 at ¶ 8.)

In the end, the Jennings were all charged with violation of Conn. Gen. Stat. Sections 53a-181, breach of peace in the second degree, and 53a-167a, interfering with officers. (ECF Nos. 27-19 at ¶ 62, 43-1 at ¶ 62.) Eric was also charged with violation of Sections 29-37i, unsafe storage of a firearm, and 53a-61aa, threatening in the first degree. (ECF Nos. 27-19 at ¶ 63, 43-1 at ¶ 63.) Eric and Horace both pled no contest to violations of Section 53a-181a, for which the Connecticut Superior Court at Bridgeport found them guilty. (ECF Nos. 27-19 at ¶¶ 64–65, 43-1 at ¶¶ 64–65.) On June 5, 2013, the prosecution entered a nolle prosequi in each of Bernard's, Dennis's, and Margaret's criminal cases before the Connecticut Superior Court at Bridgeport. (ECF Nos. 27-19 at ¶¶ 66–68, 43-1 at ¶¶ 66–68.)

B. <u>Procedural History</u>

In their amended complaint, the Jennings allege nineteen federal and state law causes of action based on this incident: (1) Fourth Amendment false arrest; (2) Fourth Amendment malicious prosecution; (3) property damage; (4) freedom of speech; (5) retaliatory arrest; (6) fabrication of

evidence; (7) excessive force; (8) failure to intervene; (9) unlawful entry into the curtilage; (10) unlawful entry into the home; (11) supervisory liability under *Monell*; (12) state law false arrest; (13) state law malicious prosecution; (14) malicious abuse of process; (15) & (16) battery; (17) intentional infliction of emotional distress; (18) violation of Conn. Gen. Stat. § 52-571c, and (19) indemnification under Conn. Gen. Stat. § 7-465. (ECF No. 17.)

On April 13, 2017, the defendants filed a motion for summary judgment on all but one of the 19 counts of the plaintiffs' amended complaint, despite submitting a record replete with hotly disputed factual issues. (ECF No. 27.) The only claim on which the defendants do not move for summary judgment is the fabrication of evidence claim. (*Id.*) On April 15, 2017, the plaintiff's filed two motions for partial summary judgment on their claims for: (1) unlawful entry into the curtilage and (2) false arrest, malicious prosecution, freedom of speech, and retaliatory arrest. (ECF Nos. 29, 30.) On May 1, 2017, the Jennings filed a motion to amend their amended complaint, seeking to add several claims and clarify their failure to intervene claim. (ECF No. 35.)

## II.    Motions for Summary Judgment

### A.    Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving parties bear the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (internal citations and alterations omitted).

If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The Court considers all facts "in the light most favorable to the nonmoving part[ies]" after drawing "all reasonable inferences in [their] favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000) (quotation marks omitted).

B. Analysis

1. *42 U.S.C. Section 1983 Claims*

a. **Fourth Amendment**

i. Malicious Prosecution

The Jennings brought a malicious prosecution claim against all officer defendants, but they now have abandoned this claim as to Carrano, Lynch, and Simpson. (ECF No. 43 at 20.) Therefore, I GRANT summary judgment in favor of these defendants, and address only Rivera's motion and Bernard's and Dennis's cross-motion for summary judgment on this claim.

"It is well settled that in order to prevail on a § 1983 claim against a state actor for malicious prosecution a plaintiff must show a violation of his [or her] rights under the Fourth Amendment and establish the elements of a malicious prosecution claim under state law." *Holman v. Cascio*, 390 F. Supp. 2d 120, 122 (D. Conn. 2005) (citing *Fulyton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002)):

> In Connecticut, the elements of a malicious prosecution claim are that (1) the defendant[s] initiated or procured the institution of criminal proceedings against the plaintiff[s]; (2) the criminal proceedings have terminated in favor of the plaintiff[s]; (3) the defendant[s] acted without probable cause; and (4) the defendant[s] acted

with malice, primarily for a purpose other than that of bringing an offender to justice.

*Turner v. Boyle*, No. 3:13–cv–616 (SRU), 2015 WL 4393005, *16 (D. Conn. July 15, 2015) (citations and internal quotation marks omitted). It is not disputed that the Jennings were all charged with criminal violations. (ECF No. 27-19 at ¶¶ 62–68, 43-1 at ¶¶ 62–68.)

### 1. Horace and Eric

Because Horace and Eric pled "no contest" to violation of Conn. Gen. Stat. Section 53a-181a, for which they were found guilty by the court (ECF Nos. 27-19 at ¶¶ 64–65, 43-1 at ¶¶ 64–65), their malicious prosecution claims fail. A plea of no contest along with a finding of guilt by the court does not meet the favorable termination requirement of a malicious prosecution claim. *See Brown v. Catania*, No. 3:06-cv-73 (PCD), 2007 WL 879081, *5 (D. Conn. Mar. 21, 2007). Therefore, I GRANT summary judgment in favor of the defendants on Horace's and Eric's malicious prosecution claims.

### 2. Bernard, Dennis, and Margaret

As for Bernard's, Margaret's, and Dennis's claims, there are issues of fact about whether the defendants had probable cause to charge them each with violation of Conn. Gen. Stat. Section 53a-167a, interfering with officers, and Section 53a-181, breach of peace. And, because the factfinder is permitted to infer malice from an arrest made when probable cause was lacking, there is also a disputed issue of material fact on this element.

Courts analyze the probable cause element of a malicious prosecution claim as of the time that an officer initiates charges. *See Lombardi v. Myers*, 14–cv–1687 (VAB), 2016 WL 4445939, at *4 (D. Conn. Aug. 18, 2016) (citations omitted). A person is guilty of interfering with an officer "when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties." Conn. Gen. Stat. § 53a-167a. "The law prohibits any action that

intentionally meddles in or hampers a police officer in the performance of her duties." *Ruttkamp v. De Los Reyes*, No. 3:10-cv-392 (SRU), 2012 WL 3596064, at *6 (D. Conn. Aug. 20, 2012) (citing *State v. Williams*, 205 Conn. 456, 471–72 (1987)). But it is not illegal to "merely question[ ] a police officer's authority or protest [ ] his or her action." *Williams*, 205 Conn. at 472. Instead, to the extent the statute applies to speech, it criminalizes only the use of "fighting words," or words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 473 (internal quotation marks omitted) (quoting *Houston v. Hill*, 482 U.S. 451, 461–62 (1987)). "[B]ecause police officers are expected to exercise a higher degree of restraint than the average citizen, [however,] the type of 'fighting words' that would violate this statute is narrower than under other actionable circumstances." *Ruttkamp*, 2011 WL 3596064, at *6 (citing *Williams*, 205 Conn. at 474 n. 7).

"A person is guilty of creating public disturbance when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he [or she] (1) engages in fighting or in violent, tumultuous or threatening behavior; or (2) annoys or interferes with another person by offensive conduct; or (3) makes unreasonable noise." Conn. Gen. Stat. § 53a-181.

The defendants argue that Rivera had probable cause to prosecute Dennis under both statutes because he resisted arrest by holding his feet outside the police vehicle and yelled at Rivera when Rivera initially asked him to leave the sidewalk and enter the yard. (ECF Nos. 27-1 at 24, 27-3 at 3.) The defendants argue that they had probable cause to arrest Bernard because his statement "What, ya'll bored or something? We wasn't doing nothing" could have been interpreted as a breach of peace or as interference with the officers. (ECF Nos. 27-1 at 24, 27-10 at 3.) And they argue that the defendants had probable cause to prosecute Margaret because she "reach[ed] into Horace's pockets prior to him being patted down." (ECF Nos. 27-1 at 25, 27-3 at 4.)

The Jennings, on the other hand, argue that Rivera did not have probable cause to bring charges against Dennis because Dennis was not obstructing the sidewalk and was already on his way into the house when Rivera pulled up. (ECF Nos. 30 at 11, 43-10 at 3.) They also assert that Dennis was not resisting Rivera by leaving his feet outside the police car: instead, he did not "have time" to put his feet into the car and "there [were] no issues" and "I didn't resist." (ECF Nos. 43 at 24, 43-10 at 25.) They also argue that Bernard's statement could not have been interpreted as threatening or interfering with the police (ECF No. 43 at 23–24) and that Rivera asked Margaret to check Horace's pockets for the keys to the house. (ECF No. 43 at 24–25.)

These arguments only underscore that the key facts are all disputed. While Dennis claims that he and his brothers were already walking into the house when Rivera made contact with them (ECF No. 43-10 at 3), Rivera claims that the brothers were blocking the sidewalk from others' access while causing a scene and that they refused to go into their house when he first asked them. (ECF No. 27-3 at 3.) Dennis also claims that Rivera did not allow him to put his feet into the car, while Rivera claims that Dennis was resisting arrest by not moving his feet inside. (ECF Nos. 27-3 at 3, 43-10 at 25.) As for Margaret, while Rivera and Lynch state that she violated an order to stay back by going through Horace's pockets, Margaret claims that she reached into Horace's pockets only because Rivera repeatedly asked her to check them for the keys to the house. (ECF No. 27-3 at 4, 27-11 at 9, 43-12 at 9.) And, although the parties do not dispute what Bernard said, they dispute how it was said and whether Rivera reasonably interpreted it as interference with an officer or disturbing the peace.[2] (*See* ECF Nos. 43-9 at 6, 43-14 at 10.) There is no evidence that

---

[2] The Jennings argue that "Rivera had no grounds to arrest Dennis and Bernard because fighting words were not used." (ECF No. 30 at 13.) They assert that "[e]ven under Rivera's version of events, there was no probable cause to arrest the Jennings" under Section 53a-167a or 53a-18 because the words that Dennis and Bernard used merely questioned Rivera's authority. (*Id.*) (citing *Dufresne v. Decrisantis*, No. 14-cv-1965 (JCH) (D. Conn. April 11, 2016) ("[S]ection 53a-167a proscribes only physical conduct and fighting words that amount to meddling in or hampering the activities of the police in the performance of their duties." (internal quotation marks omitted)) and *Acevedo v. Sklarz*, 553 F.

Rivera received any other information that would have supported probable cause for violation of either Conn. Gen. Stat. Section 53a-167a or Section 53a-181 between the time that he arrested Dennis, Bernard, and Margaret and the time that he initiated prosecution. (*See* ECF No. 27-3.)

Because Rivera would not have had probable cause to arrest Dennis, Bernard, and Margaret under their version of events, because there is no evidence that Rivera received further information bearing on probable cause after the arrest, and because a lack of probable cause could permit an inference of malice, these disputed issues properly are left for the factfinder. I therefore deny Rivera's motion for summary judgment and Dennis's and Bernard's cross-motions for summary judgment on these claims.

## ii. False Arrest

As with their malicious prosecution claims, the Jennings now have abandoned their claim of false arrest against Carrano, Lynch, and Simpson, and I GRANT summary judgment in favor of those three defendants as to false arrest. (ECF No. 43 at 20.) I address Rivera's, Dennis's, and Bernard's cross-motions as to the false arrest claim against Rivera below.

To succeed on their false arrest claims, the Jennings must establish that:

> (1) the defendant officers intentionally arrested them or had them arrested;
> (2) the plaintiffs were aware of the arrest;
> (3) there was no consent to the arrest; and
> (4) the arrest was not supported by probable cause.

*Drew v. City of Groton*, 3:09-cv-1355 (JBA), 2011 WL 2971768, at *6 (D. Conn. July 21, 2011).

Connecticut law, though, is less certain on whether the favorable termination of proceedings is a

---

Supp.2d 164, 168 (D. Conn. 2008) ("To survive constitutional scrutiny, verbal conduct may constitute illegal interference with an officer only if it rises to the level of "fighting words," i.e., words that by their very utterance inflict injury or tend to incite an immediate breach of the peace. Conduct that merely questions a police officer's authority or protests his or her action is excluded." (internal quotation marks and citations omitted)).) But, aside from their words, it is unclear from the record whether the brothers were otherwise interfering with the officers—Rivera claims that they initially refused to go inside their house when he asked them to—or were mak[ing] unreasonable noise", Conn. Gen. Stat. § 53a-181, by yelling. (*See* ECF No. 27-3 at 4.) Summary judgment is therefore inapposite.

requirement for false arrest claims. "Although the Connecticut Supreme Court has not yet spoken on the issue, the Second Circuit has held that favorable termination is [also] an element of false arrest under Connecticut law." *Ruttkamp v. De Los Reyes*, No. 3:10-cv-392 (SRU), 2012 WL 3596064, at *12 (D. Conn. Aug. 20, 2012) (citing *Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) ("[F]avorable termination is an element of a Section 1983 claim sounding in false imprisonment or false arrest.") (internal quotations omitted)). The parties do not dispute that the Jennings were aware of, but did not consent to, their arrests. (*See* ECF Nos. 27-19 at ¶ 62, 43-1 at ¶ 62.)

### 1. Horace and Eric

Again, because Horace and Eric pled "no contest" to violation of Section 53a-181a, for which they were found guilty by the court (ECF Nos. 27-19 at ¶¶ 64–65, 43-1 at ¶¶ 64–65), their false arrest claims fail. *See Ruttkamp*, 2012 WL 3596064, at *12 (citing *Miles*, 445 F. App'x at 383).

### 2. Bernard, Dennis, and Margaret

For a false arrest claim, the analysis focuses on the moment of arrest, rather than on the time when the defendant instituted charges against the plaintiff. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). But I have already determined that there are disputed issues of material fact about whether Rivera had probable cause to institute charges against Bernard, Dennis, and Margaret for violation of Conn. Gen. Stat. § 53a-167a, interfering with officers, and § 53a-181, breach of peace. As discussed above, those disputed issues all involve the events surrounding the Jennings' arrests, so I DENY Rivera's, Bernard's, and Dennis's cross-motions for summary judgment on the false arrest claim too.

### iii. <u>Excessive Force</u>

Horace has brought a claim of excessive use of force against the defendants. The only defendant, though, who he alleges used any force against him was Lynch. Therefore, I GRANT summary judgment in favor of all other defendants on this claim. Lynch has moved for summary judgment on this remaining claim.

"Determining whether a use of force was reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (quotation marks and citations omitted) (citing *Graham v. Connor,* 490 U.S. 386 (1989)). This inquiry asks "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* "In doing so, we consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Lynch's motion for summary judgment on the use of excessive force claim fails because there are plainly disputed issues of material fact. Lynch points to Rivera's incident report, which states that Horace "grabbed [Rivera] by [his] left side mid[]section" and "grabb[ed his] duty belt near [his] taser" (ECF No. 27-3 at 2) before Lynch tased him, while Horace states that Lynch tased Horace in the back while he was latching the gate, as he retreated from attempting to engage Rivera in conversation. (ECF No. 43-13 at 13–15.) Horace states that he heard "[t]ake that nigger down" before he was tased. (*Id.* at 14.) Lynch also claims that he tased Horace twice because he was "still resisting" after the first hit (ECF No. 27-11 at 4) ("And, uh, as Officer Rivera moved, uh, towards the door to get over behind some cover, uh, I guess it was the father [Horace]. Uh []he grabbed him, spun him back and—and grabbed his Taser. And at that point, I deployed my Taser, um,

which stopped him from continuing (unintelligible) and actually go down, um, and ended up getting' him down to the ground. Uh, he was still resisting. I ended up doing a drive-stun as a follow-up and, uh, got him in custody."), while Horace states that he was simply lying on the ground at that time. (ECF No. 43-13 at 13–15.) Plainly, then, whether Officer Lynch used excessive force against Horace depends on whose version of events is found to be more credible. That finding is for the factfinder, and so I DENY Lynch's motion for summary judgment on the use of excessive force claim.

## iv.  Failure to Intervene

The defendants have moved for summary judgment on Horace's failure to intervene claim as well. "A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers. Failure to intercede to prevent an unlawful arrest can be grounds for Section 1983 liability." *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 129 (2d Cir. 1997). Because the failure to intervene claim depends on the underlying proof of a constitutional violation and because I have determined already that there are disputed facts as to whether Lynch violated Horace's Fourth Amendment right to be free from excessive force by tasing him twice, I must also deny the defendants' motion for summary judgment on this claim.

## v.  Unlawful Entry into Curtilage

The parties have cross-moved for summary judgment on this claim, but the Jennings have abandoned their claims against all defendants except Rivera. They specifically have limited their claim for unlawful entry into the curtilage to Rivera's "entry into the curtilage, by opening the

latched gate into the fenced-in yard surrounding the Jennings' property, without consent, without a warrant[,] and absent exigent circumstances."[3] (ECF No. 17 at ¶ 184.)

"[T]he curtilage of the house," or the area "immediately surrounding [the] house," "enjoys protection as part of the home itself." *Jardines*, 569 U.S. at 5–6. The Fourth Amendment's protection of curtilage, however, "d[oes] not extend to the open fields." *U.S. v. Dunn*, 480 U.S. 294, 300 (1987) (citing *Hester v. United States*, 265 U.S. 57, 59 (1924)). "[T]he extent of curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Dunn*, 480 U.S. at 300. The "central component" of the inquiry is "whether the area harbors the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *Id.* (internal quotation marks and citations omitted). Four factors to consider in this inquiry are:

(1) "the proximity of the area claimed to be curtilage to the home";
(2) "whether the area is included within an enclosure surrounding the home";
(3) "the nature of the uses to which the area is put"; and
(4) "the steps taken by the resident to protect the area from observation by people passing by."

*Id.* at 301. These factors, though, are meant to be "useful analytical tools" rather than "a finely tuned formula that, when mechanically applied, yields a 'correct' answer." *Id.*

The Jennings argue that Rivera's entry into the gate constitutes a Fourth Amendment violation solely because Rivera pursued Dennis into the Jennings' yard without probable cause. (*See* ECF No. 43 at 3–10.) This argument is unavailing, though, because it fails to address the threshold issue of whether the area inside the Jennings' yard constitutes curtilage under *Dunn*. If

---

[3] I make no determination about whether the Jennings' porch is Fourth Amendment-protected curtilage because they have specifically limited their claim to Rivera's initial entry into the gate.

their yard is not curtilage, Rivera would not have violated the Fourth Amendment just by entering the gate. *See Dunn*, 480 U.S. at 300.

Further, although the record suggests that this incident took place in the Jennings' side yard, it does not include clear evidence as to what the side yard actually looked like. There are mentions of a "side driveway" and a "streetlight" in the Jennings' descriptions of where the incident began (*see* ECF No. 43-1 at 14, 43-3 at ¶ 4), which Horace, in his affidavit, states were "near the gate to the side entrance to my house." (ECF No. 29-4 at 1.) These references imply that the incident took place in the side yard, as does the police report which states that the police initiated the incident while the Jennings brothers were standing on Stillman Street. (ECF No. 27-3 at 3.) Horace's affidavit states that "[t]he streetlight can be seen in Ex. A" to his affidavit (ECF No. 43-7 at ¶ 6), but that photo shows the front view of the Jennings home with the streetlight around the corner. (*Id.* at 7.) It does not provide a clear view of the side yard. Horace's affidavit also states that its Exhibit B shows the "[s]ide entrance gate where [his] family picture was taken and [the] gate that I had closed before getting tased." (*Id.* at 4.) But that photo provides only a partial view of the gate, the yard, and the entrance because the Jennings family members are featured in the frame. (*Id.* at 9.) The image does not show a clear view of the yard—e.g., whether there is grass, and it does not show the degree to which the entire side yard is visible from the street. There is also little evidence in the record about the uses "to which the area was put." *Dunn*, 480 U.S. at 301. Under these circumstances, I cannot determine whether the Jennings had a reasonable expectation of privacy in this area. Therefore, I DENY both Rivera's and the Jennings' cross-motions for summary judgment on the curtilage claim.

### vi. <u>Unlawful Entry into Home</u>

The defendants have also moved for summary judgment on the Jennings' claim of unlawful entry into the home. The officers did not have a warrant to enter the Jennings' home or property. They argue instead that the exigent circumstances exception to the warrant requirement justified their entry into the Jennings' home. (ECF No. 27-1 at 17–19.) But, again, there are disputed facts on the critical issue—whether there were exigent circumstances justifying a warrantless entry— that would make summary judgment improper.

"The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable." *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014) (internal quotation marks omitted) (citing *Kentucky v. King*, 563 U.S. 452, 459 (2011)). Probable cause to enter the home is "the first requirement for a warrantless search on the basis of exigent circumstances." *Harris*, 770 F.3d at 231 (citing *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

If there is probable cause to justify the entry, "[t]he essential question in determining whether exigent circumstances justified a *warrantless* entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *Harris*, 770 F.3d at 233–34 (emphasis added) (internal quotation marks omitted) (quoting *Loria v. Gorman*, 306 F.3d 1272, 1284–85 (2d Cir. 2002)). This is an objective test that "turns on [an] examination of the totality of circumstances confronting law enforcement agents in the particular case." *U.S. v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990). The Second Circuit has "often referred to six factors . . . as guideposts for determining whether exigent circumstances are present":

    (1) "the gravity or violent nature of the offense with which the suspect is to
        be charged";

    (2) "whether the suspect is reasonably believed to be armed";

    (3) "a clear showing of probable cause to believe that the suspect committed
        the crime";

    (4) "strong reason to believe that the suspect is in the premises being
        entered";

    (5) "a likelihood that the suspect will escape if not swiftly apprehended";
        and

    (6) "the peaceful circumstances of the entry."

*Harris*, 770 F.3d at 234 (internal alteration omitted) (quoting *U.S. v. Moreno*, 701 F.3d 64, 73 (2d

Cir. 2012 and citing *U.S. v. MacDonald*, 916 F.2d 766, 769–70 (1997)). "In determining whether

there was an urgent need to take action, the gravity of the underlying offense is considered an

important part of the constitutional analysis." *Harris*, 770 F.3d at 235 (internal quotation marks

and alterations omitted).

    Here, the parties have presented entirely different accounts of the events that led the

officers to enter the Jennings' home. The defendants claim that Eric yelled threats to "light [them]

up" through a first floor window and that, because they knew that he had a gun permit and had

been a passenger in a vehicle involved in a shooting while carrying a firearm, his threat was

credible enough to create exigency. (ECF Nos. 27-1 at 19–20, 27-19 at ¶¶ 46–51.) Eric does not

dispute that he owned a gun and had a gun permit and that he was a passenger in the vehicle that

was stopped weeks earlier. (ECF Nos. 47-1 at ¶¶ 48, 60.) The parties also agree that Lynch

authorized the officers to force entry into the Jennings' house, where Simpson, Carrano, and other

officers detained Bernard, Eric, and Eric's girlfriend and conducted a protective sweep, during

which they found the gun in a second floor bedroom. (ECF Nos. 27-19 at ¶¶ 51, 57, 58–60, 47-1

at ¶¶ 51, 57, 58–60.)

    But there is a dispute about whether Eric threatened the defendants. Rivera stated in his

deposition that, after Lynch had tased Horace, Eric yelled from inside the first floor window,

directly next to the door, that "he was going to kill [the officers] and, you know, that—that we were going to be fucking dead." (ECF No. 27-4 at 17.) In the incident report, Rivera stated that Eric yelled "I'm going to kill both of you. You both are fucking dead. I'm going to light you guys up." (ECF No. 27-3 at 3.) Eric disputes that he made any comments that could have been perceived as threats. He states instead: "I looked [out] the window and that's when I heard 'Pow' and that's when I seen my father go like this (*indicating*). I'm looking at my Bernard [sic], because he's in the house, [and I said] 'They shot Dad.' I'm like 'You can't shoot my father.' And he didn't even do nothing." (ECF No. 43-11 at 6.) Eric continued, saying "[o]ne of the cops went to stick the taser in the window. I closed the window, I locked it. I looked out the window and that's when Rivera's like 'Your ass is coming with me. I'm coming to get you.'" (*Id.*) In Eric's version of events, he made no threat against the officers.

Because the dispute about whether Eric threatened the officers and whether they reasonably found the threat credible bears directly on whether they had probable cause and whether there were exigent circumstances, summary judgment is inapposite on this claim as well.

vii.  Property Damage

The defendants have moved for summary judgment on the Jennings' claim for property damage based on the officers' kicking down two internal bedroom doors in the Jennings' house while conducting a protective sweep. The defendants assert that they are not liable for property damage because there was a need to do a protective sweep of the house and to access locked areas by kicking in doors because Eric's possession of a gun created a safety risk, even after they had detained Eric, Bernard, and Bernard's girlfriend. (ECF No. 27-19 at ¶ 60.)

"[V]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for . . . property damage[.]"

*Cabral v. City of New York*, 662 Fed. App'x 11, 13 (2d Cir. 2016) (internal quotation marks omitted). But, if the search was lawful, property damage resulting from actions necessary to conduct the search is not necessarily actionable. *Koller v. Hilderbrand*, 933 F. Supp.2d 272, 278 (D. Conn. 2013) ("Some property damage caused during a lawful search is not *per se* unreasonable within the meaning of the Fourth Amendment.").

The plaintiffs have submitted evidence that the defendants damaged two internal doors as well as their external door, when they entered the house (ECF No. 43-8 at 9, 11), and I have already determined that there are disputed issues of material fact about whether the officers' entry was unlawful. Because this claim, too, depends at least in part on whether the entry was lawful, I DENY the defendants' motion for summary judgment.

### viii. Qualified Immunity

The defendants claim that they are entitled to qualified immunity on: (1) the claims against Rivera for entry into the curtilage; (2) the claims against the officers for entry into the Jennings' home; (3) the claims against Rivera for unlawful arrest and malicious prosecution; and (4) the claim against Lynch for excessive use of force. (ECF No. 27-1 at 10–30.) They argue that an objectively reasonable officer would not have thought that their actions violated clearly established law. (*See id.*)

Qualified immunity protects a government official from liability for damages unless his actions violate a "clearly established statutory or constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). More specifically, the officers are entitled to qualified immunity (1) "if [their] action did not violate clearly established law" or (2) if "it was objectively reasonable for [them] to believe that [their] action did not violate such law." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (internal citations

omitted). "[C]learly established law should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "[W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). "Although qualified immunity is a question of law, because [the] issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted." *Maye v. Vargas*, 638 F. Supp.2d 256, 262 (D. Conn. 2009).

When the evidence is viewed in the light most favorable to the Jennings, it shows that the officers violated the Jennings' clearly established rights. For the Jennings' claims of entry into the curtilage, if Rivera entered an area of the Jennings' property in which they had a reasonable expectation of privacy without probable cause to arrest Dennis and without exigent circumstances, as the Jennings' claim in their testimony (*see* ECF No. 43-1 at ¶¶ 12–16), this would be a violation of the Jennings' clearly established rights under the Fourth Amendment. *See Jardines*, 569 U.S. at 5–6. Similarly, for the Jennings' claim of unlawful entry into their home, if the officers entered the Jennings' home without a warrant or without probable cause and exigent circumstances, as the Jennings claim they did (*see* ECF No. 43-1 at 16), this would also be a violation of their clearly established Fourth Amendment rights. *See Harris*, 770 F.3d at 233–34; *see also U.S. v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990). Further, if Rivera arrested Bernard, Dennis, and Margaret without probable cause and then instituted charges (*see* ECF No. 43-1 at 8–10, 11–12,

14–15), he also violated their clearly established Fourth Amendment right to be free from unreasonable seizure. *See Weyent v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). In the Jennings' version of events, Rivera would not have had probable cause to arrest any of them: Bernard and Dennis were simply walking back into their home when asked to do so by Rivera when they were arrested, even if they had made snarky comments, and Margaret was simply complying with an order to look in Horace's pocket for the house keys when she was arrested. (*See* ECF No. 43-1 at 8–10, 11–12, 14–15.) And, finally, if Lynch tased Horace while Horace was simply bending over to close the gate (*see* ECF No. 43-1 at 13–14) as Horace states that he did, Lynch violated Horace's clearly established right under the Fourth Amendment to be free from excessive force. *See Weather v. City of Mount Vernon*, No. 08 CIV. 192 RPP, 2011 WL 1046165, at *10 (S.D.N.Y. Mar. 22, 2011) ("It was clearly established at the time of this incident that a police officer could not lawfully apply a degree of force to an individual that was unreasonable in light of the totality of the circumstances." (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).

The defendants argue that they are entitled to summary judgment on the false arrest, malicious prosecution, and unlawful entry claims because the officers had "arguable probable cause" and because they were making quick decision in a chaotic situation, justifying their entry into the house and the curtilage and justifying their arrests of Margaret, Dennis, and Bernard. (*See* ECF No. 27-1 at 14–15, 21–22, 24–25.) But that argument adopts the defendants' *own version of the events*. The Jennings deny that there were neighbors gathered to watch the scene, and, although they do admit that there was some yelling back and forth between the officers and themselves, in the Jennings' version of events, there was not even arguable probable cause to arrest Margaret, Dennis, or Bernard or to enter the house or the curtilage. (ECF No. 43-1 at 8–17.) The defendants also argue that qualified immunity protects Lynch from Horace's claim of excessive force because

Lynch believed that Horace was a threat to Rivera.[4] (ECF No. 27-1 at 27–30.) But, again, that belief could have only been reasonable *in Lynch's version of events*. In Horace's version of events, no reasonable officer would have thought that he was a threat to any of the other officers while bending over to close the gate, such that use of a taser was necessary. (*See* ECF No. 43-1 at 13–14.) In short, there are disputed issues of fact that preclude the entry of summary judgment on qualified immunity grounds.

### ix. *Monell* Liability

Because the plaintiffs state that they are "not pursuing the *Monell* claim in Count Eleven" (ECF No. 43 at 50), I GRANT summary judgment for the defendants on that claim and dismiss the City of Bridgeport and Chief Gaudette from the case, as that was the only claim the Jennings brought against those defendants.

## b. First Amendment

The defendants have moved for summary judgment on the Jennings' First Amendment claims, and Dennis and Bernard have cross-moved for summary judgment. Although the Jennings list both "Freedom of Speech," Count Four, and "Retaliatory Arrest," Count Five, as claims in their amended complaint (ECF No. 17 at 15–16), these claims are identical because they both

---

[4] As part of his argument that he is entitled to qualified immunity on Horace's excessive force claim, Lynch asserts that, even if he violated Fourth Amendment by tasing Horace twice, he is still entitled to summary judgment because qualified immunity protects his actions. (ECF No. 27-1 at 29.) He argues that there is no clearly established law prohibiting the use of "non-lethal force of a taser." (*Id.*) (citing *Soto v. Gaudette*, No. 3:10-CV-106 (WWE), 2015 WL 6453083, at *5 (D. Conn. Oct. 23, 2015).) The defendants cite that decision as saying "This Court has found no Second Circuit or Supreme Court precedent establishing a right not to be subjected to non-lethal force of a taser as of January 23, 2008." (ECF No. 27-1 at 29.) What that case actually stated is that there is no precedent that a *fleeing suspect* has a right not to be subject to nonlethal force. *Soto*, 2015 WL 6453083 at *5 ("This Court has found no Second Circuit or Supreme Court precedent establishing *that a fleeing suspect had* a right not to be subjected to non-lethal force of a taser as of January 23, 2008.") (emphasis added). Apart from misstating its holding, the defendants also fail to mention the subsequent history of *Soto*: although on other grounds, the Second Circuit reversed that decision in part, and the original order was vacated in part on reconsideration. *See Soto*, 2015 WL 6453083, *rev'd in part, appeal dismissed in part sub nom. Soto v. Gaudett*, 862 F.3d 148 (2d Cir. 2017), and *order vacated in part on reconsideration*, No. 3:10-CV-106 (WWE), 2017 WL 3613021 (D. Conn. Aug. 22, 2017).

allege that the Jennings all engaged in protected speech and that they then were arrested as a result, so I will treat them as one claim. *See Coffey v. Callaway*, 86 F. Supp.3d 111, 121–22 (D. Conn. 2015) ("Count II alleges that this conduct by [the d]efendants violated [the p]laintiff's first amendment right to free speech. Count III alleges that by their conduct, [the d]efendants retaliated against the plaintiff for exercising those rights. The substance of Coffey's speech and the [d]efendants' conduct are the same in each count. These are both First Amendment retaliation claims, although that noun appears only in Count III.") (internal quotation marks and alterations omitted). Also the Jennings state that they are pursuing this claim only against Rivera, except for Margaret, who is also pursuing a claim against Lynch. (ECF No. 43 at 44–49.) Therefore, I GRANT summary judgment for all other defendants on this claim.

"To prevail on this free speech claim, plaintiff must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). For the third requirement, the Second Circuit has clarified that "chilled speech is not the *sine qua non* of a First Amendment claim," and, in fact, "a plaintiff has standing if he [or she] can show *either* that his speech has been adversely affected by the government retaliation *or* that he has suffered some other concrete harm." *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 956 (2d Cir. 2015) (internal quotation marks and alterations omitted). "The existence of probable cause . . . . will also defeat a First Amendment claim that is premised on the allegation that the defendants prosecuted a plaintiff out of a retaliatory motive, in an attempt to silence [him or her]." *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012).

Dennis and Bernard made statements prior to their arrest that, when viewed in the light most favorable to them, constituted speech criticizing the police. (ECF Nos. 27-1 at 24, 27-10 at 3. 43-10 at 3.) I have already determined that there are disputed issues of material fact about whether Rivera had probable cause to arrest Dennis or Bernard, so summary judgment is also inappropriate on their retaliatory arrest claims. *See Fabrikant*, 691 F.3d at 215. According to his testimony, Eric also made a statement to the police—that they could not tase his father—and was then arrested. (ECF No. 43-11 at 6.) But because there are disputed issues about what Eric said as discussed above and because "true threats" are not protected by the First Amendment, *see Virginia v. Black*, 538 U.S. 343, 359 (2003), summary judgment is also inappropriate for his retaliatory arrest claim. Therefore, I DENY both motions for summary judgment on the retaliatory arrest claims against Rivera.

Horace's and Margaret's claims for retaliatory arrest, though, fail as a matter of law. They have not presented any evidence that they were arrested in retaliation for First Amendment-protected speech. According to Horace, he was bending over closing his gate when he was tased and then arrested; he does not allege that he made any protected speech. (ECF No. 43-13 at 13–15.) Margaret states that the defendants asked her to look for the keys to the house in Horace's pockets but that they then arrested her for interference when she put her hand in his pocket. She does not allege that she said anything for which she was then arrested. Instead, she claims that she "glared at Lynch, because she felt [the officers] were trying to lie [about Horace attacking Lynch]" and that Lynch "said: 'Oh, you think you're smart!' because Margaret was glaring at him. Then Lynch grabbed Margaret's arm and twisted it behind her back and handcuffed her tightly [because of her glare]." (ECF No. 43 at 48.) That claim fails as a matter of law: to have a First Amendment claim, Margaret must have engaged in First Amendment-protected speech, *Curley*, 268 F.3d at 73,

and a disapproving look does not constitute such speech. Therefore, I GRANT Lynch's motion for summary judgment on Margaret's and Horace's claims for retaliatory arrest and DENY their motion for summary judgment.

### 2. Connecticut Law Claims

The defendants argue that I should "decline to assert supplemental jurisdiction over the remaining state law claims" and remand this case back to the state court because "summary judgment is appropriate as to the" federal law claims, leaving only state law causes of action. (ECF No. 27-1 at 39.) However, this argument is unpersuasive because, even had I granted the defendants' entire motion for summary judgment, they did not move for summary judgment on the falsification of evidence claim, meaning that an unresolved federal law claim would remain. Further, I am denying the defendants' motion for summary judgment on a substantial portion of the Jennings' claims because disputed issues of material fact remain. Therefore, the state law claims also will remain for the factfinder to decide.

The only exception to this is the Jennings' false arrest and malicious prosecution claims. Although these are state law claims, because Section 1983 incorporates Connecticut state law for malicious prosecution and false arrest claims, the analysis for these state law claims is the same as discussed above. I GRANT Lynch's, Carrano's, and Simpson's motion for summary judgment on the Jennings' false arrest and malicious prosecution claims. I also GRANT Rivera's motion for summary judgment on Horace's and Eric's claims of malicious prosecution and false arrest because the criminal proceedings did not terminate in their favor. Because disputed issues of fact remain as to whether probable cause supported the arrests of Margaret, Bernard, and Dennis, I DENY Bernard's, Dennis's, and Rivera's cross-motions for summary judgment on these two claims.

### III.    Motion to Amend

The Jennings have also filed two motions to amend: a motion to amend and then a substituted motion to amend. The first motion to amend I DENY as moot. The second motion to amend seeks to amend the Amended Complaint (ECF No. 17) to include a claim of excessive force by Margaret against Lynch and a claim of failure to intervene by all of the defendants against Carrano.

Leave to amend a complaint after a responsive pleading has been filed should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). "Although a court should freely give leave to amend where justice so requires, this must be balanced against the requirement under Rule 16(b) that the [c]ourt's scheduling order shall not be modified except upon a showing of good cause." *Velez v. Burge*, 483 F. App'x 626, 628 (2d Cir. 2012) (internal quotation marks and citations omitted). "The court plainly has discretion . . . to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (holding that the district court did not abuse its discretion by denying a motion to amend after the parties completed discovery and the defendant filed a motion for summary judgment). The primary consideration in determining whether good cause has been shown is "whether the moving party can demonstrate diligence." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).

The plaintiffs have not shown good cause to amend their complaint at this late stage. They did not file their first motion to amend until May 1, 2017, which was two weeks after the defendants filed their motion for summary on April 13, 2017, and two weeks after they had filed their own motions for summary judgment on April 15, 2017. (ECF Nos. 27, 29, 30, 35.) The

Jennings claim that "[i]t should be obvious that the omissions were merely an oversight" and that "[t]he [amended] complaint narrows and clarifies the issues and is thus helpful to the defendants." (ECF No. 37 at 5.) On the contrary, the plaintiffs' proposed amended complaint asserts two new claims—a claim of excessive force by Margaret against Lynch, instead of just by Horace, and a claim of a failure to intervene by all the plaintiffs, instead of just by Horace—for which the defendants did not have notice while they were conducting discovery and preparing their summary judgment motion. The Jennings' assertion that these additions should have been obvious is unpersuasive. While the Jennings did not specify which of the plaintiffs were suing which of the defendants for most of their claims in the Amended Complaint, they did for these two claims, so it was understandable that the defendants conducted discovery with that in mind. (*See* ECF No. 17.) Because of the complex facts of the incident at issue, adding these claims would raise new issues and would prejudice the defendants, as they had already filed their motion for summary judgment before receiving notice of the amended complaint.

Because I find that allowing the Jennings to amend their complaint now would prejudice the defendants, because they delayed in filing their motion to amend until after discovery and summary judgment motions, and because they have offered no satisfactory explanation for the delay, I DENY the substituted motion to amend and DENY the motion to amend as moot. (ECF Nos. 35, 37.) The Amended Complaint (ECF No. 17) is the operative complaint for trial.

## IV.  Conclusion

For the reasons stated above, the defendant's motion for summary judgment is GRANTED in part and DENIED in part. I DENY the plaintiffs' motions for partial summary judgment. (ECF Nos. 29, 30.) I DENY the Motions for Leave to File Excess Pages (ECF Nos. 39 and 40) as moot. I also DENY the Motion to Amend/Correct (ECF No. 35) as moot. I DENY the Substituted Motion

to Amend. (ECF No. 37.) Because no claims remain against the City of Bridgeport or Gaudette, the Clerk's office is instructed to terminate them from this case.

Jury selection in this case is scheduled for **December 5, 2018 at 9:00 a.m.**, with evidence to start immediately thereafter. The Joint Trial Memorandum is due **October 3, 2018**. Should the parties wish to proceed to mediation, they shall file a joint statement certifying that (1) counsel have conferred with their clients and each other, (2) the parties wish to proceed to mediation, (3) the parties are willing to participate in settlement efforts at such mediation in good faith, and (4) counsel believe that a mediation stands at least a reasonable chance of resolving the case without trial. The statement should also state whether the parties are willing to proceed to mediation before a magistrate judge. The claims remaining for trial are:

(1) federal and state law false arrest by Dennis, Bernard, and Margaret against Rivera;

(2) federal and state law malicious prosecution by Dennis, Bernard, and Margaret against Rivera;

(3) property damage by the Jennings against the defendants;

(4) First Amendment retaliatory arrest by Dennis, Bernard, and Eric against Rivera;

(5) fabrication of evidence by the Jennings against Rivera;

(6) excessive force by Horace against Rivera;

(7) failure to intervene by Horace against the defendants;

(8) unlawful entry into the home and the curtilage by the Jennings against the defendants;

(9) malicious abuse of process by the Jennings against the defendants;

(10) battery by Margaret and Horace against Lynch;

(11) intentional infliction of emotional distress by the Jennings against the defendants;

(12)    violation of Conn. Gen. Stat. Section 52-571c by the Jennings against the defendants; and

(13)    indemnification under Conn. Gen. Stat. Section 7-465 by the Jennings against the defendants.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:    Hartford, Connecticut
        February 20, 2018